UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SHAWNTE BARR,

        **Plaintiff,**

v.                                                                  5:17-CV-378(BKS/DEP)

BASS PRO SHOPS,

        **Defendant.**

_____

**Appearances:**

Shawnte Barr, Pro se
Auburn, New York

Andrew P. Marks
Pamela S.C. Reynolds
Littler Mendelson, P.C.
375 Woodcliff Drive, 2nd Floor
Fairport, New York
For Defendant

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

      Plaintiff Shawnte Barr, an African-American, brings this action pro se under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, against her former employer, Defendant Bass Pro Shops, asserting that Defendant failed to promote her, failed to train her, subjected her to a hostile work environment, and hired her under false pretenses, all on the basis of her race. (Dkt. No. 1). Presently before the Court is Defendant's motion to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 13).

Plaintiff opposes the motion. (Dkt. No. 16). For the following reasons, Defendant's motion is granted in part and denied in part.

## II.     BACKGROUND[1]

In May 2014, Plaintiff attended a job fair at Cayuga Community College. (Dkt. No. 1, at 6). Plaintiff stopped at the Bass Pro Shops booth, where she asked Karen Raybuk whether Bass Pro Shops was "hiring for office positions." (Dkt. No. 1, at 6). Raybuk responded that it was not but asked Plaintiff to leave her resume and complete an application because the "company did a lot of hiring from within all the time" and that she would keep Plaintiff "in mind if they were hiring for an office positions." (*Id*.). Plaintiff submitted an application. (*Id*.).

Plaintiff interviewed first with Raybuk, then with an individual named "Andrea." (Dkt. No. 1 at 6). During both interviews, Plaintiff emphasized that she "wasn't looking for a cashier's position," that she was in her "last semesters of college and would be receiving [her] Bachelor's degree by the end of the year." (*Id*.). Raybuk assured Plaintiff that she "could move up in the company quickly" if she "took the cashiers position." (*Id*.). Andrea told Plaintiff that if she started as a cashier, she (Andrea) "would ensure that [Plaintiff] would move up in the company quickly" and that "she had two positions in Credit Cards and Customer Service opening in the summer that [Plaintiff] would be perfect for." (*Id*.). Plaintiff accepted the position, but told Raybuk that she "was only accepting the position with the hopes that [she] would be able to move up within the company." (*Id*.).

Upon hiring, Plaintiff received training on the "minimum basics of the software on the registers, which was far more complicated" than registers Plaintiff had used in the past. (Dkt. No. 1, at 7). Plaintiff "noticed that other new, white employees had been shown how to use the

---

[1] The Court only recounts those facts necessary to the disposition of the motion. The facts are taken from the Complaint and its attachments and assumed to be true for the purposes of this motion. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

cash registers when they came in." (*Id*.). Team Leads—or shift supervisors—gave extra work to other cashiers "to do away from the registers" but gave Plaintiff "menial tasks . . . to keep [her] stationary at the register." (*Id*.). Additionally, during Plaintiff's "first weeks" at the store, "a Team Lead . . . became physical" with Plaintiff, and "pushed [Plaintiff] out of the way" when she asked for help with a customer." (*Id*.).

On or about May 29, 2014, Plaintiff was assisting a customer at the cash register and requested assistance with a price change from a Team Lead. (Dkt. No. 1, at 9). Plaintiff asked the customer to wait while she went to find the Team Lead, who was not "standing behind the podium." (*Id*.). When the Team Lead returned, she yelled at Plaintiff "in front of the customer, and was rude, telling [Plaintiff that she] shouldn't have made [the customer] wait." (*Id*.).

After Plaintiff was hired, Defendant hired six new front end cashiers, including two white females, who "were promoted to the jobs" Andrea had said Plaintiff "was qualified for," and who Plaintiff had helped to train after they were hired, and one white male, who was moved to the Fishing Department. (*Id*.).

At one point, a Team Lead, noting that Plaintiff had a short shift, asked Plaintiff if she "wanted to answer phones . . . in the cash office." (Dkt. No. 1, at 8). Before Plaintiff "could say yes, the Store Manager shook his lightly [sic] at" the Team Lead, and Plaintiff "was sent to the generic registers, which was against store policy, because there were already enough cashiers on that day." (*Id*.).

Plaintiff received multiple assignments to the "mall registers" in June and July. (Dkt. No. 1, at 9). The mall registers were in the back of the store and led into the Finger Lakes Mall and were in "an area isolated from the front-end registers, as well as other people." (*Id*.). After working at the mall registers during her previous two shifts, Plaintiff asked the Team Lead if

someone else could work there. (*Id*.). The Team Lead took the issue to Andrea. (*Id*.). When Andrea asked Plaintiff "what was the problem" Plaintiff suggested that because none of the cashiers liked working at the mall registers, they should "switch after a couple of hours during out shifts instead of staying down there our whole shift." (*Id*.). "Andrea got angry and emotional" with Plaintiff and Plaintiff was subsequently "called in the office to speak with upper management" and "written up for having an attitude with Kathy." (*Id*.). Several months later, however, Plaintiff's idea was implemented and "cashiers rotated every two hours at the mall registers instead of being there for six hours." (*Id*.).

On "numerous occasions," Plaintiff worked the same shift as another employee, Samantha, who "continuously harassed [Plaintiff] about [her] political views." (Dkt. No. 1, at 10). Plaintiff told Samantha that she did not "discuss politics in the workplace" but Samantha "started talking about Obama being the President, and how she liked him at first, but how things had gotten messed up." (*Id*. at 10). "Samantha also continuously talked about her love of the confederate flag and how people got the wrong idea about what the flag represented." (*Id*.). Samantha told Plaintiff that she had lunch with her friend, "an African American girl," and they "were talking about the confederate flag and the girl got mad, got up from the table, and accused her of being racist," but that Samantha maintained that "just because she liked wearing the confederate flag didn't mean she didn't like black people." (*Id*.).

During the "holiday season of 2014," Plaintiff noticed a "sign posted that said the Fishing Department was looking for a Team Lead." (*Id*.). When Plaintiff talked to Raybuk about the position, Raybuk said she was not "qualified for the position." (*Id*.). Plaintiff, however, heard one employee from the Fishing Department say that he did not "know anything about fishing." (*Id*.).

After hiring Plaintiff, Raybuk and Andrea asked Plaintiff to "friend" them "on Facebook," but Plaintiff did not because it was her "personal page" and they may not have understood it without getting to know her first. (Dkt. No. 1 at 10). Plaintiff is "a strong advocate of learning about African and African American History, and [her Facebook] post talked about lynching's [sic], the Jim Crow south, the beauty of Africa." (*Id*. at 10–11). Plaintiff noticed in late 2014 and early 2015 that her "co-workers would walk past [her] quoting [her] Facebook posts." (*Id*. at 10). Plaintiff complained to a store manager, but he told her to "ignore it." (*Id*.). After that, Plaintiff felt that she did not "have anyone to turn to at the store." (*Id*.).

Other employees "got their friends and family members to harass [Plaintiff] directly. (*Id*. at 11). On January, 17, 2015, for example, a footwear employee "who had been rolling her eyes" at Plaintiff since she started working at the store, left footwear and "stood behind the register" where Plaintiff was working. (*Id*.). The employee had a conversation with a "group of young white males" who had come into the store, and who, after shopping, approached Plaintiff's register. (*Id*.). "One of the white males had a Confederate belt and a wallet that he wanted [Plaintiff] to see." (*Id*.).

In February 2015, Plaintiff agreed to switch shifts with another employee. (Dkt. No. 1 at 12). Andrea observed their conversation and watched Plaintiff and the other employee complete the necessary paperwork. Plaintiff "had a long line so [she] couldn't stop to look at the paper work, but [she] trusted [the other employee] to do the right thing." (*Id*.). Plaintiff reported for work on the "day [she] switched" with the other employee. (*Id*.). When she reported to work for her "next scheduled shift," however, she was told that she "had a no call no show." (*Id*.). Plaintiff explained that the other employee "was supposed to work that day because [they]

5

switched." (*Id*.). The other employee had "deliberately filled out the wrong paper work, and Andrea let her do it." (*Id*.).

On February 7, 2015, Plaintiff overheard another employee ask where to take "the black hangers . . . because different hangers go in different departments" and that after being told where to place the hangers, the employee said "That's racist." (Dkt. No. 1 at 12). Plaintiff spoke to Andrea about the incident. (*Id*.).

On February 27, 2015, Plaintiff overheard and recorded a conversation between two employees—Jake and Jorge—in the breakroom. (Dkt. No. 1 at 12). Jake was "talking about his huge poster of Hitler that he had just purchased" as well as "his Swastika plates." (*Id*.). When Plaintiff complained about this conversation to her supervisors, her supervisor asked "So now you're telling me [Jake] doesn't have the right to his own beliefs?" and made no other response. (*Id*.).

In May 2015, Plaintiff "started wearing [her] hair in its natural curly pattern"—prior to that she had been "wearing wigs because it was cooler." (Dkt. No. 1, at 12). "[S]omeone had something to say about [Plaintiff's] hair every day . . . and it wasn't always complimentary" because people "were intimidated by [Plaintiff's] curly afro." (*Id*.). "Samantha Nicholas came up to [Plaintiff] while [she] was at the mall registers and said she wanted to shave all her hair off." (*Id*.). When Plaintiff wore a headband with flowers, one of the Team Leads commented that her hair looked "like a bird's nest." (*Id*. at 13).

Sometime before the "2014-2015 holidays," Plaintiff left work and found a small dent on the driver's side of her car, that "all the tire caps" had been removed, and that there were scratches where there had not been previously. (Dkt. No. 1, at 14). As a result, Plaintiff "started parking in . . . places other than employee parking." (*Id*.). In Spring or Summer 2015, when

6

Raybuk instructed Plaintiff to park her car in employee parking, Plaintiff explained that "things" had happened to her car but Raybuk assured her that nothing would happen to her car and told Plaintiff that was where she "was supposed to park." (*Id*.). A few days later, Plaintiff found a flyer on her car "with the words The Lynch Mob." (*Id*.).

Plaintiff has observed "people in trucks with Bass Pro decal [sic] riding down [her] street," which is not normal for her street. (Dkt. No. 1, at ¶ 15). In the spring or summer of 2015, Plaintiff heard "bird and duck calls (which Bass Pro sells) outside her window" in the middle of the night and has observed "backwoods" people walking by her house "blowing bird calls or duck calls." (*Id*. at 15). As all employees are required to have a rewards card, any employee can look up any other employee's address by typing the employee's name into the rewards card system. (*Id*.).

According to the Complaint, Plaintiff filed charges with the United States Equal Employment Opportunity Commission in June 2015 (Dkt. No. 1, at 4)[2] and received a right to sue letter on or about January 9, 2017. (*Id*. at 19).

## III.    STANDARD OF REVIEW

To survive dismissal under Rule 12(b)(6), "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014). Since Plaintiff is

---

[2] Plaintiff states in her opposition to Defendant's motion to dismiss that she filed charges with the EEOC in 2016. (Dkt. No. 16, at 15).

proceeding pro se, the Court must also liberally construe the Amended Complaint in her favor. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

## IV.   DISCUSSION

Defendant moves to dismiss the Complaint on the grounds that: Plaintiff's claims are outside the statute of limitations; Plaintiff failed to exhaust her administrative remedies; the Complaint fails to allege a discrimination claim; the Complaint fails to allege a hostile work environment claim; and the Complaint fails to allege a claim of "hired under false pretenses" under New York law.  (Dkt. No. 13).  Plaintiff opposes the motion.  (Dkt. No. 16).

### A.   Statute of Limitations

"As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (quoting *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003)); *see also* 42 U.S.C. § 2000e–5(e) and (f).  "Title VII requires that individuals aggrieved by acts of discrimination file a charge with the EEOC within . . . 300 days 'after the alleged unlawful employment practice occurred.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e–5(e)(1)). The Title VII exhaustion requirements, and their filing deadlines, operate as an affirmative defense. *Hardaway*, 879 F.3d at 491.  "[T]he burden of pleading and proving Title VII exhaustion" therefore "lies with defendants."  *Id*.

"Statute of limitations defenses are affirmative defenses, which normally cannot be decided on a motion to dismiss." *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 287 (S.D.N.Y. 2009).  "However, an exception is made where the complaint *facially* shows

8

noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading." *Id*. (internal quotation marks omitted).

It is not clear from the Complaint, which states that Plaintiff filed the EEOC charge on "6 / 20 15," whether Plaintiff is alleging that she filed the EEOC charge in June 2015 or on June 20, 2015.[3] (Dkt. No. 1, at 4). Further complicating the issue is Plaintiff's indication in her response to Defendant's motion that she filed charges in 2016. (Dkt. No. 16, at 15). Even if Plaintiff did not file a timely EEOC charge, because the Complaint suggests that Plaintiff was suffering medical issues during her employment and the letter from the EEOC, which is attached to the Complaint, notes that Plaintiff's doctor said that she had "a temporary disability," around the time her employment was terminated, (Dkt. No. 1-1, at 18), equitable tolling of the filing deadline may be appropriate. *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) ("Equitable tolling is generally considered appropriate . . . where a plaintiff's medical condition or mental impairment prevented her from proceeding in a timely fashion."); *see also Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) ("[F]iling a timely charge of discrimination with the EEOC is . . . a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."). As factual development is required, the Court cannot say that "the affirmative defense appears on the face of the pleading." *In re S. African Apartheid Litig.*, 617 F. Supp. 2d at 287.

Defendant asserts that "the Court must dismiss any claim in the Complaint that was not raised with the EEOC." (Dkt. No. 13-1). It acknowledges, however, that "[i]t is unclear from Plaintiff's Complaint precisely what . . . conduct was not set forth in her EEOC charge." (Dkt. No. 13-1, at 29). Dismissal on this ground, therefore, is not appropriate. The exhaustion requirement is not a pleading requirement but an affirmative defense, *see Hardaway*, 879 F.3d at

---

[3] Defendant interprets this as June 20, 2015. (Dkt. No. 13-1, at 27).

491, and the Complaint alleges that Plaintiff, prior to bringing suit, "filed charges" with the EEOC "regarding the alleged discriminatory acts." (Dkt. No. 1, at 4). Accordingly, Defendant's motion to dismiss on the ground of exhaustion is denied.

### B. Title VII

Defendant argues that because Plaintiff has not identified an adverse action "such as a termination or demotion," the Complaint fails to state a cause of action for discrimination under Title VII. (Dkt. No. 13-1, at 19–21). This argument is without merit, as discussed below, Title VII allows cause of action for allegations of failure to promote, failure to train, and hostile work environment on the basis of race.

#### 1. Failure to Promote

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A race discrimination claim under Title VII "is subject to the burden-shifting evidentiary framework set forth in *McDonnell Douglas*." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 312 (2d Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973)). As this motion is one to dismiss, however, the Court "focus[es] only on whether the allegations in the complaint give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a litigation." *Id*.

To make a prima facie showing of failure to promote under Title VII, a plaintiff must establish that: "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's

10

qualifications." *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009). "[W]hile a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss, it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *EEOC v. Port Auth. of New York & New Jersey*, 768 F.3d 247, 254 (2d Cir. 2014) (internal citations, alterations, and quotations omitted).

Plaintiff alleges that her supervisors assured her upon hiring that she "would move up in the company quickly," and indicated that Plaintiff "would be perfect for" two positions that would be opening that summer—positions in Credit Cards and Customer Service. Defendant "overlooked" her for these positions, however, and hired two, less experienced, white employees instead. (Dkt. No. 1, at 6). Plaintiff further alleges that when she asked one of her supervisors about a Team Lead position in the Fishing Department, the supervisor told her she was not qualified (though Plaintiff asserts that product knowledge was not a prerequisite), and gave the position to a white employee. (Dkt. No. 1, at 7). Plaintiff's claim that she was not promoted to several positions within the store for which she was qualified and that Defendant placed white employees in these positions instead satisfies her "minimal" burden of alleging that she was denied a promotion on the basis of her race. *Vega*, 801 F.3d at 86; *see also Littlejohn*, 795 F.3d at 313 ("The fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage of the Title VII analysis, including at the pleading stage."); *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A showing of disparate treatment—that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for purposes of making

out a prima facie case.") (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). Accordingly, Defendant's motion to dismiss Plaintiff's failure to promote claim is denied.

### 2. Failure to Train

"A plaintiff may . . . present a disparate treatment discrimination claim based on her employer's failure to train her or provide her with equal access to training." *Risco v. McHugh*, 868 F. Supp. 2d 75, 101 (S.D.N.Y. 2012) (citing *Fincher v. Depository Tr. & Clearing Corp.*, No. 06 CIV. 9959 (WHP), 2008 WL 4308126, at *3, 2008 U.S. Dist. LEXIS 70046, at * 7–8 (S.D.N.Y. Sept. 17, 2008)); *see La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 211 (2d Cir. 2010) ("Training is a benefit of employment that receives protection under Title VII." (citing 42 U.S.C. § 2000e–2(d)). "To prevail, a plaintiff must show that her employer offered the training to similarly situated employees, and that she was denied that training under circumstances that give rise to an inference of discrimination." *Id*.

Plaintiff claims that that Defendant provided training on the "minimum basics of the software on the registers," and that "other new, white employees had been shown how to use the cash registers when they came in." (Dkt. No. 1, at 7). Plaintiff further alleges that Kevin, "who worked in Credit Cards" discouraged Plaintiff from interacting or asking questions during his explanation for the procedure applicable to a "promotion for credit cards" that was "going on" at the store. (*Id*.). Plaintiff does not allege that she received less training on the cash registers than white employees, nor does Plaintiff allege that she did not receive training on the credit card promotion. In the absence of any plausible inference that she was denied equal access to training, Plaintiff fails to allege a failure to train claim.

### 3. Hostile Work Environment

To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) "is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive"; (2) creates an environment "that the plaintiff subjectively perceives as hostile or abusive"; and (3) "creates such an environment because of the plaintiff's [race]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir. 2001)). "Ultimately, to avoid dismissal under FRCP 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse,' and 'we have repeatedly cautioned against setting the bar too high' in this context." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).

Defendant argues that the Complaint fails to allege a plausible hostile work environment claim because the acts she relies on are "unrelated and discrete" and include "allegations of conduct by customers and other unnamed individuals outside" the store. (Dkt. No. 13-1, at 22–24). Many of the incidents Plaintiff recounts in the Complaint bear no obvious connection to race. For example, Plaintiff alleges that supervisors assigned her "menial tasks," that a supervisor yelled at her in front of a customer, and that she was written up after complaining about working at the "mall registers." (Dkt. No. 1, at 7, 9). There are a number of other incidents, however, that allow a reasonable inference that Plaintiff was subjected to a hostile work environment on the basis of race. Construed liberally, the Complaint alleges that when she was hired, her supervisors promised that she would move up quickly and that there were

13

positions she "would be perfect for." (Dkt. No. 1, at 6). Defendant instead gave the positions to white employees whom Plaintiff had helped train. (*Id*.).

Plaintiff alleges that an employee with whom she worked on "numerous occasions" "continuously talked about her love of the confederate flag and how people got the wrong idea about what the flag represented." (Dkt. No. 1, at 10). Further, according to the Complaint, in late 2014 and early 2015, store employees, who had viewed her Facebook posts, which concerned African and African-American History, lynchings, and the Jim Crow south, began to "walk past [her] quoting [her] Facebook posts." (Dkt. No. 1, at 11). Plaintiff complained to the store manager about the harassment, but he told her to "ignore it." (*Id*.).

Plaintiff further alleges that "employees got their friends . . . to harass [her] directly." (*Id*.). For example, on January 17, 2015, an employee from the Footwear department, who had a habit of "rolling her eyes" at Plaintiff, "stood behind the register" where Plaintiff was working and spoke with a "group of young white males" who had come into the store. These males then brought their shopping to Plaintiff's register and one "had a Confederate belt and wallet" he wanted Plaintiff to see. (*Id*.). One month later, Plaintiff overheard two employees talking about a "huge poster of Hitler" that one of them had just purchased, and "his Swastika plates." (Dkt. No. 1, at 12). When Plaintiff reported this to her managers, one responded "So now you're telling me [Jake] doesn't have the right to his own beliefs?" and "nothing was done about the harassment." (*Id*.).

In May 2015, when Plaintiff began "wearing [her] hair in its natural curly pattern" employees commented on it on a daily basis, and the comments were not "always complimentary." (*Id*. at 12). One employee told Plaintiff that she wanted to "shave all her hair off"—the employee was referring to her own hair, not Plaintiff's. (*Id*.). When Plaintiff wore a

14

headband with flowers, a Team Lead commented that her hair looked "like a bird's nest." (*Id*. at 13).

Finally, in the spring or summer of 2015, after learning that Plaintiff's had not been parking in the employee parking area, Plaintiff's supervisor told her that she was required to park in "employee parking." (*Id*. at 14). Plaintiff explained that her car had been damaged when she had left it in employee parking. (*Id*.). Her supervisor assured her that her car would be safe. (*Id*.). Plaintiff "got out of work a few days later to find a flyer with the words: The Lynch Mob." (*Id*.).

Plaintiff alleges a course of conduct by supervisors and employees that occurred consistently over a period of six or seven months in 2014 to 2015, which included the promotion of two less experienced white employees to positions she had been promised, displays of the Confederate flag that were directed toward her in what could plausibly inferred to be a taunting manner, negative comments about her "curly afro," a discussion of an employee's collection of a Hitler poster and Swastika plates, and the placement of a flyer with the words "The Lynch Mob" on her car while she was at work just days after her supervisor had told her to park her car in employee parking. While Plaintiff does not allege that she complained about all of these incidents, when she did complain, she received no response. Moreover, viewed in isolation, these incidents – the comments about Plaintiff's hair in particular, do not necessarily allow an inference of race-based animus. *See*, *e.g.*, *Bryant v. Begin Manage Program*, 281 F. Supp. 2d 561, 570 (E.D.N.Y. 2003) (explaining that comments by the program director that the plaintiff, who was black, should dress like her "while pointing at her 'Afrocentric' dress and the disparaging of [the plaintiff's] dyed, blond hair do not, by themselves, give rise to an inference of discrimination" but that "coupled with the comments of [the plaintiff] being a 'wannabe,'" the

15

plaintiff had "presented a prima facie of a prohibited animus giving rise to an inference of discrimination"). Construed liberally, and viewed in totality, however, these allegations are sufficient to allow an inference that Plaintiff was faced with racially motivated "harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Patane*, 508 F.3d at 113; *see also Kemp v. CSX Transp., Inc.*, 993 F. Supp. 2d 197, 212 (N.D.N.Y. 2014) (finding factual questions on the plaintiffs' hostile work environment claim where there was evidence that the plaintiffs "were subjected to vulgar racial language throughout their employment and often viewed racial slurs and Confederate flags displayed prominently on walls of regional offices" and employees had used racial slurs in their presence); *see also Devers v. SNC-Lavalin Generation, Inc.*, No. 12 CV 3747 RJD CLP, 2014 WL 4954623, at *5, 2014 U.S. Dist. LEXIS 141296, at *12–13 (E.D.N.Y. Sept. 30, 2014) ("There is no question that the display of the Confederate flag recalls a history of racial oppression that is offensive to many, and justifiably so."). Accordingly the Court concludes Plaintiff has sufficiently alleged a claim of hostile work environment.

### C. Hired Under False Pretenses

Defendant argues that "hired under false pretenses" "is not generally a recognized claim under Title VII." (Dkt. No. 13-1, at 25). The factual basis for this claim appears to be Defendant's promise to Plaintiff that if she accepted a cash register position, she would be promoted and move up quickly through the company. The Court construes this as a failure to promote claim under Title VII, discussed above. Construed liberally, these allegations also suggest that Plaintiff is asserting a state law claim of fraudulent inducement.

Under New York law,

> to recover damages for fraud, the plaintiff must prove a misrepresentation or a material omission of fact which was false and known to be false by defendant,

>made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury.

*Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421 (1996).  "An at-will [employee] . . . cannot state a fraudulent inducement claim . . . upon any representations of future intentions as to the duration or security of h[er] employment."  *Laduzinski v. Alvarez & Marsal Taxand LLC*, 132 A.D.3d 164, 168 (1st Dep't. 2015).  Even assuming the Complaint adequately alleges that Defendant hired her under false pretenses, i.e., that she would be promoted quickly, and that she relied to her detriment on those false representations by abandoning her job search, Plaintiff "was an employee at will, and as such, could be terminated at any time."  *Meyercord v. Curry*, 38 A.D.3d 315, 316 (1st Dep't 2007).  Thus, "any reliance on representations of future intentions, such as . . . future changes," is "deemed unreasonable as a matter of law."  *Id*.  Accordingly, Defendant's motion to dismiss Plaintiff's state law fraudulent inducement claim is granted.

## V.     AMENDED COMPLAINT

In recognition of Plaintiff's status as a pro se litigant and because it seems possible that Plaintiff may be able to assert a cognizable failure to train claim with better pleading, leave to file an amended complaint within thirty (30) days of the date of this Order is granted.  The Court, however, is dismissing Plaintiff's fraudulent inducement claim with prejudice as Plaintiff was an at-will employee and cannot meet the pleading requirements for such a claim as a matter of law.

In any amended complaint, Plaintiff must clearly set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act.  Any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely

upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (quotation marks omitted)). If Plaintiff fails to file an amended complaint within thirty days, this case will proceed on the basis of the original Complaint.

## VI. CONCLUSION

For these reasons, it is

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 13) is **GRANTED** as to Plaintiff's Title VII failure to train claim, and New York state law fraudulent inducement claim; and it is further

**ORDERED** that Plaintiff's Title VII failure to train claim is **DISMISSED without prejudice** to repleading within thirty (30) days of the date of this order; and it is further

**ORDERED** that Plaintiff's state law fraudulent inducement claim is **DISMISSED with prejudice**; and it is further

**ORDERED** that Defendant's motion to dismiss is otherwise **DENIED**; and it is further

**ORDERED** that Plaintiff is granted leave to file an amended complaint within thirty (30) days of the date of this Order; and it is further

**ORDERED** that if Plaintiff fails to file an amended complaint within thirty (30) days of the date of this Order, this case will proceed on the basis of the original Complaint; and it is further

**ORDERED** that the Clerk of the Court is directed to serve this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  March 13, 2018

Brenda K. Sannes
U.S. District Judge