**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

SHAWNTÉ BARR,

                    Plaintiff,                                  5:17-cv-00378 (BKS/ML)

v.

BASS PRO OUTDOOR WORLD, LLC,

                    Defendant.
_____

**Appearances:**

_Plaintiff pro se_:
Shawnté Barr
Auburn, New York

_For Defendant_:
Jacqueline Phipps Polito
Pamela S.C. Reynolds
Littler Mendelson, P.C.
375 Woodcliff Drive, Suite 2D
Fairport, New York 14450

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Shawnté Barr brings this action pro se under Title VII of the Civil Rights Act of

1964 ("Title VII"), _as amended_, 42 U.S.C. § 2000e _et seq_., against her former employer,

Defendant Bass Pro Outdoor World, LLC ("Bass Pro")[1] alleging that it failed to promote her and

subjected her to a hostile work environment on the basis of her race. (Dkt. No. 1). Defendant

moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No.

---

[1] Defendant was originally incorrectly sued as Bass Pro Shops. (Dkt. No. 1). The Court's docket sheet has been updated to reflect its correct name, Bass Pro Outdoor World, LLC. (Dkt. No. 27).

51). Plaintiff opposes. (Dkt. No. 56). For the reasons set forth below, Defendant's motion for summary judgment is granted.

## II.    FACTS[2]

### A.    Plaintiff's Employment at Bass Pro

In April or May 2014, Plaintiff attended a job fair at Cayuga Community College. (Dkt. No. 1, at 6; Dkt. No. 51-3, at 12). Plaintiff stopped at the Bass Pro booth and asked Karen Rebuck,[3] a Human Resources Manager at Bass Pro's store in Auburn, New York, whether Bass Pro was "hiring for office positions." (Dkt. No. 1, at 6). Rebuck responded that it was not but asked Plaintiff to leave her resume and complete an application because the "company did a lot of hiring from within all the time" and that she would keep Plaintiff "in mind if they were hiring for any office positions." (*Id.*). Plaintiff applied for a cashier's position. (*Id.*; Dkt. No. 51-3, ¶ 5).

Plaintiff interviewed first with Rebuck, then with Andrea Spingler, the Customer Service Manager. (Dkt. No. 51-3, ¶¶ 2, 4). During both interviews, Plaintiff emphasized that she "wasn't looking for a cashier's position," and that she was in her "last semesters of college and would be receiving [her] Bachelor's degree by the end of the year." (Dkt. No. 1, at 6). Rebuck assured

---

[2] When Defendant filed its motion for summary judgment, it provided the Northern District of New York's "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion," (Dkt. No. 51-2), as required by Local Rule 56.2 and *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620–21 (2d Cir.1999). It advises that a "[a] response to the defendants' statement of material facts" must "admit[] and/or den[y] each of the defendants' assertions in matching numbered paragraphs," and "support[] each denial with citations to record evidence." (*Id.* at 2) (quoting N.D.N.Y. L.R. 7.1(a)(1)). Despite this, Plaintiff failed to include a response to Defendant's Statement of Material Facts, (Dkt. No. 51-6), or cite record evidence in denying and disputing any of the facts stated by Defendant. (*See* Dkt. No. 56). Under these circumstances, the Court may "deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." Local Rule 7.1(a)(3). While the Court "is not required to consider what the parties fail to point out," in deference to Plaintiff's pro se status and out of an abundance of caution, the Court has nevertheless conducted "an assiduous review of the record" to determine whether there is evidence that might support Plaintiff's claims. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). Therefore, the facts have been drawn from Defendant's statement of material facts, (Dkt. No. 51-6), the Complaint, which is verified, (Dkt. No. 1), and the exhibits, depositions, and declarations attached to Plaintiff's opposition to the motion for summary judgment, (Dkt. No. 56). The facts are taken in the light most favorable to Plaintiff.

[3] Although Ms. Rebuck's name was spelled "Raybuk" in the Complaint, (Dkt. No. 1), as the parties now appear to agree Rebuck is correct, (Dkt. No. 51-1; Dkt. No. 56), the Court utilizes this spelling.

Plaintiff that she "could move up in the company quickly" if she "took the cashiers position." (*Id.*). Spingler told Plaintiff that if she started as a cashier, Spingler "would ensure that [Plaintiff] would move up in the company quickly" and that "she had two positions in Credit Cards and Customer Service opening in the summer that [Plaintiff] would be perfect for." (*Id.*). According to Plaintiff, Spingler did "not specifically" promise her the "Credit Cards" position but the "customer service [position] was [specifically promised]." (Dkt. No. 56-5, at 27). Plaintiff accepted the cashier's position but told Rebuck that she "was only accepting the position with the hopes that [she] would be able to move up within the company." (Dkt. No. 1, at 6).

Plaintiff began working at Bass Pro on May 21, 2014. (Dkt. No. 51-3, at 24). Her starting salary was $8.00 an hour. (*Id.*). Spingler and other Team Leads—or shift supervisors—gave extra work to other cashiers "to do away from the registers" but gave Plaintiff "menial tasks . . . to keep [her] stationary at the register." (Dkt. No. 1, at 7). Additionally, during Plaintiff's "first weeks" at the store, "a Team Lead . . . became physical" with Plaintiff, and "pushed [Plaintiff] out of the way" when she asked for help with a customer. (*Id.* at 9). Plaintiff did not report this incident to the store manager. (*Id.*)

On or about May 29, 2014, Plaintiff was assisting a customer at the cash register and requested assistance with a price change from a Team Lead. (*Id.*). Plaintiff asked the customer to wait while she went to find the Team Lead, who was not "standing behind the podium." (*Id.*). When the Team Lead returned, she yelled at Plaintiff "in front of the customer, and was rude, telling [Plaintiff that she] shouldn't have made [the customer] wait." (*Id.*).

After Plaintiff was hired, Defendant hired six new front-end cashiers, including two white females, who "were promoted to the jobs" Spingler had said Plaintiff "was qualified for," and who Plaintiff had helped to train after they were hired, and one white male, who was moved to

the Fishing Department. (*Id*. at 7). Plaintiff never applied for these positions or any other position at Bass Pro. (Dkt. No. 51-6, ¶ 16).

At one point, a Team Lead, noting that Plaintiff had a short shift, asked Plaintiff if she "wanted to answer phones . . . in the cash office." (Dkt. No. 1, at 8). Before Plaintiff could say yes, Store Manager Rob Barber "lightly shook his head no." (Dkt. No. 56-6, at 50). Plaintiff "was sent to the generic registers, which was against store policy, because there were already enough cashiers on that day." (Dkt. No. 1, at 8).

In summer 2014, people "in trucks with Bass Pro decal[s]" began driving down Plaintiff's street. (Dkt. No. 1, at 15; Dkt. No. 51-2, at 39–40). There were "kids riding by and trucks being loud and obnoxious." (Dkt. No. 51-2, at 40). Plaintiff has "lived on [her] street for over 25 years" and " knows what's normal and not normal for [her] street, backwoods behavior on [her] street isn't normal." (Dkt. No. 1, at 15).

Plaintiff received multiple assignments to the "mall registers" in June and July 2014. (Dkt. No. 1, at 9). The mall registers were in the back of the store and led into the Finger Lakes Mall and were in "an area isolated from the front-end registers, as well as other people." (*Id*.). When she arrived to work on August 27, 2014, Team Lead Kathleen Harris asked Plaintiff to work at the mall registers. (*Id*.; Dkt. No. 51-3, at 57). Because Plaintiff had worked at the mall registers during her previous two shifts, Plaintiff asked Harris if someone else could work there. (Dkt. No. 1, at 9). Harris took the issue to Spingler. (*Id*.). When Spingler asked Plaintiff "what . . . the problem" was, Plaintiff suggested that because none of the cashiers liked working at the mall registers, they should "switch after a couple of hours during our shifts instead of staying down there our whole shift." (*Id*.). Spingler "got angry and emotional" with Plaintiff. (*Id*.). "After the incident" with Harris and Spingler, Plaintiff was "called in the office to speak with

upper management," including Barber and Assistant Store Manager Bob Ryan, and was "written up for having an attitude with Kathy [Harris]." (*Id*.; Dkt. No. 51-2, at 55).

During the meeting with Barber and Ryan, Plaintiff began crying and "reported other things to them"[4] and told them "things that were going on." (Dkt. No. 51-2, at 57). According to Barber, "[Plaintiff] express[ed] concerns about her employment but did not provide specific information about her concerns." (Dkt. No. 51-5, ¶ 12). Barber told Plaintiff "to come to him from that point on" if "anything" else happened. (*Id*.; Dkt. No 51-2, at 57).

Around September 1, 2014, Spingler met with Plaintiff to discuss her 90-Day Performance Appraisal. (Dkt. No. 51-3, ¶ 13). Plaintiff received a positive assessment of her performance. (*Id*. at 54–55; Dkt. No. 56-5, at 16). She received an increase in her hourly rate from $8.00 to $8.30. (Dkt. No. 51-3, at 55).

On "numerous occasions," Plaintiff worked the same shift as another employee, Samantha, who "continuously harassed [Plaintiff] about [her] political views." (Dkt. No. 1, at 10). Plaintiff told Samantha that she did not "discuss politics in the workplace" but Samantha "started talking about Obama being the President, and how she liked him at first, but how things had gotten messed up." (*Id*.). "Samantha also continuously talked about her love of the confederate flag and how people got the wrong idea about what the flag represented." (*Id*.). Samantha told Plaintiff that she had lunch with her friend, "an African American girl," and they "were talking about the confederate flag and the girl got mad, got up from the table, and accused her of being racist," but that Samantha maintained that "just because she liked wearing the confederate flag didn't mean she didn't like black people." (*Id*.). On one occasion, Samantha

---

[4] Plaintiff could not recall what "she reported to them." (Dkt. No. 51-2, at 57).

"rub[bed] in [Plaintiff's] face" how Plaintiff had to work "the mall registers for [her] entire shift." (*Id.*).

In September 2014, Plaintiff was told by a co-worker named Brooke that "people were spreading rumors" that Plaintiff had "stormed out." (*Id.*; Dkt. No. 51-2, at 58). When Plaintiff "went to the store manager, Rob Barber, and told him about this," he told Plaintiff "to ignore it." (Dkt. No. 1, at 10). On another occasion, Brooke "got [Plaintiff's] attention . . . [and] she showed [her] that she was wearing a shirt with a confederate flag on the back of it." (*Id.* at 11).

During the "holiday season of 2014," Plaintiff noticed a "sign posted that said the Fishing Department was looking for a Team Lead." (*Id.* at 7). When Plaintiff talked to Rebuck about the position, Rebuck said she was not "qualified for the position," (*id.*), because Plaintiff "had not been there long enough." (Dkt. No. 51-2, at 72). Plaintiff heard one employee from the Fishing Department say that he did not "know anything about fishing." (Dkt. No. 1, at 7).

After hiring Plaintiff, Rebuck and Spingler asked Plaintiff to "friend" them "on Facebook," but Plaintiff did not because it was her "personal page" and they may not have understood it without getting to know her first. (*Id.* at 10). Plaintiff is "a strong advocate of learning about African and African American History, and [her Facebook] post talked about lynching's [sic], the Jim Crow south, the beauty of Africa." (*Id.* at 10–11). Plaintiff noticed in late 2014 and early 2015 that her "co-workers would walk past [her] quoting [her] Facebook posts." (*Id.* at 10). Additionally, a co-worker "who was working next to [Plaintiff] started singing a song [she] posted on Facebook." (*Id.* at 11). Plaintiff complained to Barber, but he told her to "ignore it." (*Id.*). After that, Plaintiff felt that she did not "have anyone to turn to at the store." (*Id.*).

During the 2014 holiday season, a co-worker named Jocelyn "stood right behind [Plaintiff], burped in [her] ear, and said 'I don't excuse my burps.'" (*Id*. at 11). Plaintiff told Spingler about the incident, who could "barely hold her laughter in" but made Jocelyn "apologize to [Plaintiff]." (*Id*.) Plaintiff also complained to Spingler "about being harassed, various harassments, quite a few. To the point where [Spingler] asked [Plaintiff] if she wanted to move to a different department."[5] (Dkt. No. 56-6, at 26). Plaintiff said yes but was not moved.

On November 25, 2014, Team Lead Amy Whaley "stereotyped Plaintiff while she was using vocabulary cards and asked Plaintiff if they were her tarot cards." (Dkt. No. 56, at 14; Dkt. No. 56-1, at 19). On December 2, 2014, Whaley "was rude to an African American customer and became argumentative with him" in front of Plaintiff. (Dkt. No. 56, at 14; Dkt. No. 56-1, at 21). When Plaintiff spoke up for the customer, Whaley "started getting really, really upset with [Plaintiff], started arguing with [her] and yelling." (Dkt. No. 56-6, at 46).

Other employees "got their friends and family members to harass [Plaintiff] directly." (Dkt. No. 1, at 11). On January 17, 2015, for example, a footwear employee "who had been rolling her eyes" at Plaintiff since she started working at the store, left the footwear department and "stood behind the register" where Plaintiff was working. (*Id*.). The employee had a conversation with a "group of young white males" who had come into the store, and who, after shopping, approached Plaintiff's register. (*Id*.). "One of the white males had a Confederate belt and a wallet that he wanted [Plaintiff] to see." (*Id*.).

In February 2015, Plaintiff agreed to switch shifts with another employee. (*Id*. at 12). Spingler observed their conversation and watched Plaintiff and the other employee complete the necessary paperwork. (*Id.*). Plaintiff "had a long line so [she] couldn't stop to look at the paper

---

[5] Plaintiff could not recall the nature of the harassment she complained about to Spingler.

work, but [she] trusted [the other employee] to do the right thing." (*Id.*). Plaintiff reported for work on the "day [she] switched" with the other employee. (*Id.*). When she reported to work for her "next scheduled shift," however, she was told that she "had a no call no show." (*Id.*). Plaintiff explained that the other employee "was supposed to work that day because [they] switched." (*Id.*). The other employee had "deliberately filled out the wrong paper work, and Andrea [Spingler] let her do it." (*Id.*).

On February 7, 2015, Plaintiff overheard another employee ask where to take "the black hangers . . . because different hangers go in different departments" and after being told where to place the hangers, the employee said: "That's racist." (*Id.* at 12).

On February 27, 2015, Plaintiff overheard and recorded a conversation between two employees in the breakroom. (*Id.*). One of the employees was "talking about his huge poster of Hitler that he had just purchased" as well as "his Swastika plates." (*Id.*). Plaintiff complained about this conversation to her supervisor, Perry Planck. (*Id.*; Dkt. No. 51-4, ¶ 4). When Planck spoke "with the male associate who [Plaintiff] said had been talking about swastikas," "[t]he associate explained that another associate had asked if he has dinner plates with swastikas on the them, and he was responding to [that] question." (Dkt. No. 51-4, ¶ 5). Planck was "unable to substantiate any conduct had occurred that violated Bass Pro policy." (*Id.* ¶¶ 4–6; Dkt. No. 51-6, ¶ 24). Later, when Plaintiff brought up the incident with Ryan and Spingler, Ryan replied, "[s]o now you're telling me [the associate who was talking about swastikas] doesn't have a right to his own beliefs?" (Dkt. No. 1, at 12).

In May 2015, Plaintiff "started wearing [her] hair in its natural curly pattern"—prior to that she had been "wearing wigs because it was cooler." (*Id.*). "[S]omeone had something to say about [Plaintiff's] hair every day . . . and it wasn't always complimentary" because people "were

intimidated by [Plaintiff's] curly afro." (*Id*.). "Samantha Nicholas came up to [Plaintiff] while [she] was at the mall registers and said she wanted to shave all [Nicholas'] hair off." (*Id*.). When Plaintiff wore a headband with flowers, one of the Team Leads commented that her hair looked "like a bird's nest." (*Id*. at 13).

Sometime before the "2014-2015 holidays," Plaintiff left work and found a small dent on the driver's side of her car, that "all the tire caps" had been removed, and that there were scratches where there had not been previously. (*Id*. at 14). As a result, Plaintiff "started parking in . . . places other than employee parking." (*Id*.). In Spring or Summer 2015, when Rebuck instructed Plaintiff to park her car in employee parking, Plaintiff explained that "things" had happened to her car but Rebuck assured her that nothing would happen to her car and told Plaintiff that was where she "was supposed to park." (*Id*.). A few days later, Plaintiff found a flyer on her car "with the words: The Lynch Mob." (*Id*.).

In the spring or summer of 2015, Plaintiff heard "bird and duck calls (which Bass Pro sells) outside her window" in the middle of the night and has observed "backwoods" people walking by her house "blowing bird calls or duck calls." (*Id*. at 15). These bird calls continued until the spring or summer of 2016. (Dkt. No. 56-6, at 96). At one point, Plaintiff got a "glimpse of two, a male and a female, walking up and down the street after [she] heard birdcalls one night" and they wore coats that had a camo print like the kind that Bass Pro sells. (Dkt. No. 51-2, at 43–44). All employees are required to have a rewards card, and any employee can look up any other employee's address by typing the employee's name into the rewards card system. (Dkt. No. 1, at 15).

In May 2015, Plaintiff alleges that her co-workers were rude to her twice in connection to Plaintiff's use of walkie-talkies. First, when she called the Fishing Department for help with a

customer, an associate asked her why she didn't call a manager. (*Id*. at 12). Second, Plaintiff called multiple times on a walkie-talkie for help with a customer, and a supervisor later came over to her "mad" and told her "she needed to make [herself] clear." (*Id*. at 13). After this incident, Plaintiff was "called into the manager's office for disciplinarian [sic] complaints. Employees started complaining about [Plaintiff] for made up reasons. When [she] asked the assistant manager to make the complaints formal, he said no." (*Id*.)

On May 20, 2015, Spingler and Ryan met with Plaintiff for her Annual Review. (Dkt. No. 51-3, ¶ 16). Plaintiff met or exceeded expectations in all areas except for "ability to work with others," for which she received a 2 ("marginal/needs improvement"). (*Id*. at 77). Plaintiff received a salary increase to an hourly rate of $9.00. (*Id*.).

On June 6, 2015, two white employees "were staring at [Plaintiff] like they were waiting for something to happen. [Plaintiff] asked them why they were looking at [Plaintiff] like that." (Dkt. No. 1, at 13). Ryan and Spingler spoke with Plaintiff about the incident, because the employees had written complaints that said that Plaintiff "was being rude to them." (*Id*.; Dkt. No. 51-3, at 71–73).

On June 10, 2015, a customer told Plaintiff he "owned stock in Bass Pro in an intimidating tone of voice" and then "took out a badge and asked if Bass Pro gave discounts to police officers." (Dkt. No. 1, at 14). On other occasions, the timing of which is unclear, Plaintiff alleges that "[t]here were several customers who came in using tone, body, language, etc. to intimidate and harass [Plaintiff]." (*Id*.). For example, a white man approached Plaintiff and asked "You see those pictures hanging on the wall? . . . Well I am Bass Pro," and then "walked away angrily." (*Id*.).

On June 21, 2015, Plaintiff "had just started taking a new medication and it was causing side effects." (*Id*.). Plaintiff went to the bathroom and took longer than expected, and when she returned a co-worker "started yelling at [her]." (*Id*.). By that time at work, "just about everyone in the store was rolling their eyes at [Plaintiff] and giving [her] dirty looks." (*Id*.). Additionally, Plaintiff claims that she was asked for a doctor's note regarding her bathroom use when "[Bass Pro] did not require the same treatment of Caucasian employees." (Dkt. No. 56, at 15; *see also* Dkt. No. 56-6, at 48–49).

Plaintiff alleges several other incidents of harassment, but the record is unclear as to when they occurred. First, a co-worker named Debbie left a packet of Banana Boat sunscreen near Plaintiff's register, which Plaintiff claims "can be perceived as innocent; however, Debbie is from a generation that depicted African Americans as subhuman and referred to African Americans as monkeys and apes." (Dkt. No. 56, at 14; *see also* Dkt. No. 56-6, at 74–79). Second, a Team Lead named Brian "said that he was a computer whiz, and that he could do anything on a computer." (Dkt. No. 1, at 11). Plaintiff's "Wi-Fi printer started coming on by itself after [Plaintiff] started working for Bass Pro Shops." (*Id*.). Third, Plaintiff was told to use Locker 187 by a co-worker, and "187 is a [police code for] murder." (Dkt. No. 56-6, at 82). Finally, when Plaintiff was shopping at Walmart, "a man and a woman dressed in camouflage jackets were following [her] around the store . . . they said, 'You better watch you[r] back.'" (Dkt. No. 1, at 15).

On June 25, 2015 Plaintiff worked her last scheduled shift for Bass Pro. (Dkt. No. 51-3, ¶ 8). A few days later, she notified Bass Pro that she had been injured and she could not return at that time. (*Id*.). She was put on leave. (*Id*.). Around October 2015, Plaintiff spoke with Rebuck about the possibility of returning to work with physical restrictions, but Bass Pro did not

accommodate her. (Dkt. No. 51-2, at 27–28).[6] Plaintiff had back surgery in November 2015. (Dkt. No. 56-3, at 4; Dkt. No. 56, at 16). After six months of leave, she was terminated. (Dkt. No. 56-3, at 2).

### B. Plaintiff's Filing of an EEOC Charge

Plaintiff testified that she first contacted the EEOC in January 2016, when she called the EEOC and spoke to an intake operator. (Dkt. No. 51-2, at 35). The EEOC then called her back and "took [her] statement over the phone." (Dkt. No. 70-2, at 61). When asked when she filed her complaint, she stated that "[she] filed [the complaint] in January" because "that's when [she] called them, as soon as [she] got the [termination] letter from [Bass Pro]." (Dkt. No. 70-2, at 59).

When Plaintiff spoke with the EEOC in January 2016, she provided the information that was later included in her charge of discrimination. (Dkt. No. 51-2, at 36). Plaintiff recalls speaking with the EEOC at some point after the phone call in January but cannot recall when. (Dkt. No. 70-2, at 61). It appears that the EEOC sent Plaintiff a draft Charge of Discrimination with a typewritten version of her statement. (*Id*.; Dkt. No. 51-2, at 74). Plaintiff testified that she reviewed it, got the charge notarized, and sent it to the EEOC. (Dkt. No. 70-2, at 61). Plaintiff did not recall when she received the draft charge but testified that it was "probably a few days" before she signed it on June 28, 2016. (*Id.*). The charge is filed-stamped received by the EEOC on July 5, 2016. (Dkt. No. 51-2, at 74).[7] Plaintiff argues that she "could not file her EEOC Charge prior to July 5, 2016 because the EEOC was doing their investigation." (Dkt. No. 56, at 20). Plaintiff received a right to sue letter on or about January 9, 2017. (Dkt. No. 1, at 19).

---

[6] Plaintiff does not allege that Bass Pro's failure to accommodate her physical restrictions was discriminatory.
[7] Although the Complaint indicates that Plaintiff filed a charge of discrimination in June 2015, (Dkt. No. 1, at 4), this appears to be a typo because Plaintiff argues that she filed the charge in January 2016, when she spoke to the EEOC, and she has not disputed signing the charge on June 28, 2016, as reflected on the charge itself. (Dkt. No. 56, at 20; Dkt. No. 51-2, at 74).

### III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The Court must construe these facts "in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d

159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

## IV.    DISCUSSION

Defendant moves for summary judgment on the grounds that (1) Plaintiff's claims were untimely filed and are therefore time-barred and (2) the undisputed materials facts do not support her failure to promote and hostile work environment claims. (Dkt. No. 51). Defendant argues that equitable tolling is not appropriate because the Plaintiff failed to act with reasonable diligence in filing her EEOC charge, and there were no extraordinary circumstances that prevented her from filing a timely charge. (Dkt. No. 51, at 25-26). Plaintiff opposes the motion. (Dkt. No. 56).

### A.    Timeliness

"As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (quoting *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003)); *see also* 42 U.S.C. § 2000e–5(e) and (f). In New York "individuals aggrieved by acts of discrimination [must] file a charge with the EEOC within . . . 300 days 'after the alleged unlawful employment practice occurred.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e–5(e)(1)). Failing to timely file a charge "acts as a bar to a plaintiff's ability to bring the action." *Semper v. New York Methodist Hosp.*, 786 F. Supp. 2d 566, 576 (E.D.N.Y. 2011) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)).

Under the EEOC regulations "a charge is sufficient" when the EEOC receives "from the person making the charge either a written statement or information reduced to writing by the" EEOC that names the employer and "generally allege[s] the discriminatory act(s)." 29 C.F.R. §§

1626.8(b), 1626.6; *see Fed. Exp. Corp. v. Holowecki,* 552 U.S. 389, 396–97 (2008). "In addition to the information required by the regulations . . . if a filing is to be deemed a charge it must be reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." *Id.* at 402.

A charge must also be "signed and shall be verified." 29 C.F.R. § 1601.9. A verified untimely charge, however, may "relate back" to an earlier unverified charge. *See* 29 C.F.R. § 1601.12(b); *Edelman v. Lynchburg College*, 535 U.S. 106, 122 (2002); *Morales v. NYS Dep't of Labor*, 865 F. Supp. 2d 220, 239 (N.D.N.Y. 2012); *Fichera v. State Univ. of New York at Oswego*, No. 5:04-cv-0078, 2007 WL 2874450, at *5, 2007 U.S. Dist. LEXIS 72186, at *18–19 (N.D.N.Y. Sept. 27, 2007).

Plaintiff argues her claim was filed in January 2016 when she initially spoke to the EEOC and that her verified charge was delayed because "the EEOC was doing their investigation." (Dkt. No. 56, at 20). The sparse record in this pro se case does not reflect what information Plaintiff provided to the EEOC in January 2016 or when the EEOC reduced her charge to writing. Defendant has not addressed Plaintiff's argument or the EEOC regulations. *See, e.g.,* 29 C.F.R. §§ 1626.6, 1626.7. Defendant argues that the charge was filed on July 5, 2016, when it was stamped received by the EEOC. (Dkt. No. 51-1, at 23). In Defendant's view all of Plaintiff's claims occurring before September 9, 2015 (300 days prior) are time-barred.

*Morales* is instructive in determining whether Plaintiff's verified charge relates back to an earlier draft charge. 865 F. Supp. 2d at 239–40. There, the plaintiff alleged she had participated in a telephone interview with the EEOC. *Id.* at 237. The EEOC then mailed the plaintiff a formal discrimination charge "drafted from the information provided to [the EEOC]"

and instructed her to notarize it. *Id*. at 239. She received this document within the 300-day window but did not mail it until after the window had expired. *Id*. The court declined to issue summary judgment due to untimeliness because a reasonable jury could find that the "EEOC had plaintiff's written charge" because it had reduced her complaint into a draft charge before the 300 day deadline and this gave "sufficient notice to the EEOC that the plaintiff intended to 'activate the Act's machinery' as required under Title VII." *Id*. (quoting *Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 567 (2d Cir. 2006)).

Here, viewing the evidence in the light most favorable to the pro se Plaintiff, there is evidence that the EEOC had Plaintiff's written charge, though unverified, when it mailed her the draft charge "a few days" before she signed it on June 28, 2016. (Dkt. No. 70-2, at 61). *See Morales*, 865 F. Supp. 2d at 239 ("[A] jury could find that the EEOC had plaintiff's written charge before March 21, 2006 [even though] it was not yet signed and notarized.") Any conclusion that Plaintiff's oral statement had been reduced to a written charge before then would be speculative. As such, considering the Plaintiff's verified charge signed on June 28, 2016, to relate back to a draft charge a few days before then, the Court will consider all alleged discriminatory acts under Title VII occurring in or after late August 2015 as timely.[8]

### 1.    Equitable Tolling

Plaintiff makes additional arguments as to why her filing is timely. She contends that equitable tolling is appropriate because she was injured and had surgery in November 2015, (Dkt. No. 56, at 20). Plaintiff also argues that her hostile work environment claim is not time-

---

[8] The Court notes that the exact date in June is not dispositive in the case. Plaintiff's last day of work was on June 25, 2015. (Dkt. No. 51-3, ¶ 19). As such, in order for any acts that occurred while she was working at Bass Pro to be timely, her EEOC charge needed to be filed by April 20, 2016 or earlier. There is no evidence that the EEOC reduced her charge to writing at any point prior to June, and thus events that occurred during her active employment at Bass Pro are time-barred unless equitable tolling or the continuing violation doctrine, as discussed *infra* Sections IV.A.1 and IV.A.2, apply.

barred because it is subject to a continuing violation exception. (*Id.*). The Court will address each of these arguments in turn.

The timely charge requirement is "not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes*, 455 U.S. at 393. Equitable tolling applies only in "rare and exceptional circumstance[s]." *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (citing *Turner v. Johnson*, 177 F.3d 390, 391–92 (5th Cir. 1999)). A litigant "seeking equitable tolling must establish two elements: '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'" *Bolarinwa v. Williams*, 593 F.3d 226, 231 (2d Cir. 2010) (quoting *Lawrence v. Florida*, 549 U.S. 327, 336 (2007)). "Pro se filings, although held to more lenient standards, are not excused from establishing these elements." *Arias-Mieses v. CSX Transp., Inc.*, 630 F. Supp. 2d 328, 333 (S.D.N.Y. 2009).

Plaintiff asserts that equitable tolling is appropriate in this case due to her medical impairment. Equitable tolling "may be appropriate where the plaintiff's failure to comply with the statute of limitations is attributable to the plaintiff's medical condition." *Brown v. Parkchester S. Condo.*, 287 F.3d 58, 60 (2d Cir. 2002); *see also Baroor v. New York City Dep't of Educ.*, No. 06-cv-3965, 2009 WL 959537, at *5, 2009 U.S. Dist. LEXIS 29319, at *14 (E.D.N.Y. Apr. 3, 2009) (stating that a plaintiff's "medical or mental impairment which prevented plaintiff from timely filing" can constitute "[c]ircumstances that might warrant equitable tolling"). "Although illness is, on its own, insufficient for equitable tolling purposes, tolling is appropriate if a plaintiff is 'unable to protect [his] legal rights because of an overall inability to function in society' at the time an action accrues." *Mira v. Kingston*, 218 F. Supp. 3d

229, 236–37 (S.D.N.Y. 2016) (quoting *Gardner v. Wansart*, No. 05–cv–3351, 2006 WL 2742043, at *5 n.4, 2006 U.S. Dist. LEXIS 69491, at *14 n.4 (S.D.N.Y. Sept. 25, 2006)).

However, when asserting that a medical condition should toll the statute, a plaintiff's "conclusory and vague claim[s], without a particularized description of how her condition adversely affected her capacity to function generally or in relationship to the pursuit of her rights, is manifestly insufficient to justify any further inquiry into tolling." *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000) (holding that equitable tolling was not available when the plaintiff alleged that she suffered from paranoia, panic attacks, and depression); *see also Swanton v. Graham*, No. 07-cv-4113, 2009 WL 1406969, at *5, 2009 U.S. Dist. LEXIS 45806, at *13–14 (E.D.N.Y. May 19, 2009) (concluding that equitable tolling was not warranted where the plaintiff "failed to provide the Court with any objective evidence substantiating his claims of disability, detailing how long such a disability lasted, or describing how the disability was causally related to his failure to timely file").

The record indicates that Plaintiff was injured and stopped working in June 2015. (Dkt. No. 51-3, ¶ 19). Plaintiff claims that equitable tolling should apply because of this injury and because she "was injured and had surgery in November 2015 and was taking pain medication for both." (Dkt. No. 56, at 20). According to Plaintiff, she could walk after the injury, (Dkt. No. 70, at 30), though she had trouble standing for long periods of time. (*Id*. at 31–32). However, these assertions are "conclusory and vague" and do not provide a particularized description that would enable the Court to assess whether her injury and surgery affected her capacity to function or ability to pursue her rights. *Boos*, 201 F.3d at 185.

Though Plaintiff's injury or surgery may have warranted a short period of equitable tolling, Plaintiff has failed to provide evidence showing how long she was incapacitated, and

Plaintiff has not offered any reason why she could not have pursued her rights before surgery or after recovering. *See Molnar v. Legal Sea Foods, Inc.*, 473 F. Supp. 2d 428, 431 (S.D.N.Y. 2007) (denying equitable tolling on the ground of medical impairment when the plaintiff was incapacitated for one week due to the flu because "her illness did not prevent her from pursuing her legal right to sue during the other 83 days"). Indeed, evidence in the record suggests that Plaintiff explored the possibility of returning to work at Bass Pro in the fall of 2015, if Bass Pro could accommodate her need to periodically sit down during shifts. (Dkt. No. 51-2, at 27–28, 76). Plaintiff has failed to provide a particularized description of why her medical condition prevented her from timely filing an EEOC charge, and thus equitable tolling is inappropriate on these grounds.[9]

### 2.    Continuing Violation Doctrine

Though Title VII requires individuals to file a charge with the EEOC within 300 days, "[u]nder the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 156 (2d Cir. 2012) (citing *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993)).

---

[9] Equitable tolling is also unwarranted based on Plaintiff's interactions with the EEOC, because there is no evidence that the EEOC engaged in any affirmative misconduct. *See Li-Lan Tsai v. Rockefeller Univ.*, 46 F. App'x 657, 658 (2d Cir. 2002) (holding that equitable tolling was inappropriate where "there [was] no evidence that the EEOC engaged in any affirmative misconduct" and the plaintiff had not "provided any evidence, such as the name of the representative or the date on which she spoke with the representative, to corroborate her assertion that an EEOC representative gave her erroneous information"); *Lloyd v. Bear Stearns & Co.*, No. 99-cv-3323, 2004 WL 2848536, at *12, 2004 U.S. Dist. LEXIS 24914, at *35–36 (S.D.N.Y. Dec. 9, 2004) ("As plaintiff has also failed to give any evidence of affirmative misconduct on the part of the EEOC, her failure to bring her charges within the statutory time period cannot be remedied by equitable tolling.").

In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), the Supreme Court explained that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges," and "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* Though time-barred, discrete prior acts falling outside the limitations period may be used as "background evidence in support of a timely claim." *Id.* "[E]mployment practices such as failure to promote, failure to compensate adequately, undesirable work transfers, and denial of preferred job assignments are considered discrete acts." *Benjamin v. Brookhaven Sci. Assocs., LLC*, 387 F. Supp. 2d 146, 153 (E.D.N.Y. 2005).

By contrast, a hostile work environment involves "repeated conduct" that is "different in kind from discrete acts." *Morgan*, 536 U.S. at 115. It is "composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)). Even if "some of the component acts of the hostile work environment fall outside the statutory time period," the claim is timely as long as "an act contributing to the claim occurs within the filing period"; then, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.*; *accord Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004) ("When . . . a plaintiff's allegations of discrimination extend beyond the 300-day limitations period, the nature of the claim determines what consideration will be given to the earlier conduct.").

For the continuing violation doctrine to apply to a hostile work environment claim, "a plaintiff must show both that an incident of harassment occurred within the limitations period, and that this timely incident was 'part of the same actionable hostile work environment practice' as the untimely incidents.'" *Bright v. Coca Cola Refreshments USA, Inc.*, No. 12-cv-234, 2014

WL 5587349, at *4, 2014 U.S. Dist. LEXIS 155565, at *8 (E.D.N.Y. Nov. 3, 2014) (quoting *McGullam v. Cedar Graphics*, 609 F.3d 70, 76 (2d Cir. 2010)). Courts must "make an individualized assessment of whether incidents and episodes are related." *McGullam*, 609 F.3d at 76. "Incidents that involve different perpetrators, actions, or targets, or are temporally distant from one another, may be insufficiently related." *Bright*, 2014 WL 5587349, at *4, 2014 U.S. Dist. LEXIS 155565, at *9. A plaintiff may not "'resurrect stale claims by stating that dissimilar acts are related,' for to do so would transform the continuing violation doctrine into 'a boundless exception to the statute of limitations.'" *Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 544 (E.D.N.Y. 2014) (quoting *Crosland v. City of New York*, 140 F. Supp. 2d 300, 308 (S.D.N.Y. 2001)).

In this case, Plaintiff alleges both a failure to promote and a hostile work environment. Regarding her failure to promote claim, Plaintiff asserts that her supervisors assured her upon hiring her in May 2014 that she "would move up in the company quickly," and indicated that Plaintiff "would be perfect for" two positions that would be opening that summer—positions in Credit Cards and Customer Service. (Dkt. No. 1, at 6). Plaintiff was "promised" the Customer Service position. (Dkt. No. 56-5, at 27). Defendant "overlooked" her for these positions, however, and hired two white employees instead. (Dkt. No. 1, at 6). Plaintiff further alleges that when she asked one of her supervisors about a Team Lead position in the Fishing Department during the holiday season in 2014, the supervisor told her she was not qualified (because Plaintiff had not worked at Bass Pro long enough). (*Id*. at 7; Dkt. No. 51-2, at 71–72).

These discrete acts occurred in Summer 2014 and during the holiday season of 2014. (Dkt. No. 1 at 6–7). They therefore occurred long before late August 2015 (300 days before

Plaintiff filed her EEOC charge, as discussed *supra* Section IV.A) and so Plaintiff's failure to promote claim is time-barred.

Regarding her hostile work environment claim, Plaintiff contends the continuing violation doctrine applies because she claims she was harassed beginning in 2014, while she was still working at Bass Pro and continuing until after her employment ended, up until 2016,[10] by people "walking by [her house] and hiding in her neighbor's yard sounding off duck and bird calls at 3:00am." (Dkt. No. 56, at 19). During the relevant period—after late August 2015—Plaintiff was first on leave of absence from Bass Pro, (Dkt. No. 51-3, ¶ 19), and was then terminated in a letter dated January 8, 2016. (Dkt. No. 56-3, at 2). While pre-August 2015 incidents could be used "as background evidence in support of a timely claim," *Morgan*, 536 U.S. at 113, this alleged post-employment harassment at her home fails to state such a claim.

Plaintiff argues that this harassment was connected to her employment at Bass Pro, constituted further harassment and contributed to a hostile work environment, and extends the statute of limitations because it is a continuing violation. (*Id*. at 19–20).[11] Defendant argues that the continuing violation doctrine does not apply because (1) Plaintiff was no longer working at Bass Pro during this time period, (2) "Plaintiff provides no evidence that these alleged actions can, in any way, be imputed to Bass Pro," and (3) "the alleged conduct outside [Plaintiff's] home

---

[10] In her opposition to summary judgment, Plaintiff claims this harassment lasted until 2017. (Dkt. No. 56, at 19). However, her opposition brief was not sworn to, unlike her complaint. (Dkt. No. 1, at 5). It is therefore not evidence. During her deposition, which was taken under oath, Plaintiff stated that the birdcalls ceased in spring or summer 2016. (Dkt. No. 51-2, at 37–38).

[11] For the first time in her opposition to summary judgment, which is unsworn, Plaintiff asserts an additional instance of post-employment harassment: "the Human Resource Manager, Karen Rebuck, show[ed] up at Coast Physical Therapy right before one of Plaintiff's appointments." (Dkt. No. 56, at 2). Plaintiff provides no date or additional details about this alleged incident. The Court will therefore not consider it. However, the Court notes that even if this incident were considered, it would not change the Court's analysis because there is no basis for concluding it is related to Plaintiff's employment or the alleged hostile work environment.

was completely unrelated to the conduct Plaintiff untimely alleged occurred at the workplace." (Dkt. No. 63, at 7–8).

"[E]very iteration of the elements of a hostile work environment claim has required an existing employer-employee relationship and a showing that the harassment substantively affected the plaintiff's working conditions." *Ruggerio v. Dynamic Elec. System Inc.*, No. 12-cv-100, 2012 WL 3043102, at *8, 2012 U.S. Dist. LEXIS 103940, at *25–26 (E.D.N.Y. 2012); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) ("A hostile work environment claim requires a showing that the *workplace* was permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to *alter the conditions of the victim's employment*." (emphasis added)). The 2016 conduct, during a time period in which Plaintiff was not actively working for Bass Pro "had no effect upon [her] work environment, her working conditions or her ability to perform her job – the hallmarks of a hostile work environment" and no reasonable juror could find it to be a component of a hostile work environment claim. *Ruggerio*, 2012 WL 3043102, at *9, 2012 U.S. Dist. LEXIS 103940, at *27. While "Title VII does—in certain instances—protect against post-employment *retaliation*," *Mira*, 218 F. Supp. 3d at 235, Plaintiff has not brought a retaliation claim and there is no such post-employment retaliation alleged here. *See id.,* at 235–36 (finding alleged harassment outside the scope of post-employment retaliation because it was not related "to her new job or to any inability to procure employment"). Therefore, the continuing violation doctrine is inapplicable.

Even if post-employment harassment could constitute a hostile work environment, the plaintiff must show "a specific basis for imputing the hostile work environment to the employer." *Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 2001). Plaintiff has not produced evidence "to suggest that anyone [at her prior employer] either perpetrated the things

she describes . . . or caused them to happen to her." *Id*. at 236. Plaintiff alleges the harassment is connected to Bass Pro because (1) it began sometime after she started working there, (2) Bass Pro sold bird and duck calls, and (3) she once spotted two individuals walking down the street after she heard the bird calls, and they were wearing coats with a type of camo print that was sold at Bass Pro (but also sold elsewhere). (Dkt. No. 51-2, at 37–48). These vague connections to Bass Pro do not rise above mere speculation. Nor has Plaintiff offered any connection between the harassment outside her home (which does not appear to be race-based) and the claims of racial hostility she experienced in the workplace. As such, Plaintiff has failed to identify evidence from which a reasonable factfinder could conclude that the harassment outside of her home was "part of the same actionable hostile work environment practice" as the incidents that occurred during her employment as Bass Pro. *Morgan*, 536 U.S. at 103.

Accordingly, the continuing violation doctrine is inapplicable to the facts in this case and the incidents comprising Plaintiff's hostile work environment claim, all of which occurred prior to 300 days before Plaintiff filed her EEOC charge, are time-barred. Defendant is entitled to summary judgment because both the failure to promote and hostile work environment claims are time-barred.

## V.     CONCLUSION

For these reasons, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 51) is **GRANTED** in its entirety; it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED with prejudice**; it is further

24

**ORDERED** that the Clerk is directed to close this case.

**IT IS SO ORDERED.**

Dated: December 13, 2019
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge